**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch**

Civil Action No. 12-cv-2735-RPM

PAUL BAUMAN,

    Plaintiff,

v.

TELLER COUNTY, COLORADO,
THE CITY OF CRIPPLE CREEK, COLORADO,
MIKE ENSMINGER, Teller County Sheriff, in his individual and official capacity,
STAN BISHOP, Teller County Undersheriff, in his individual and official capacity,
JOSH WEATHERILL, Teller County Sheriff's Office Deputy and Member of Teller County
Emergency Response Team, in his individual and official capacity,
NICK HARTBAUER, Teller County Sheriff's Office Deputy and Member of Teller County
Emergency Response Team, in his individual and official capacity,
JESSE BAKER, Tactical Medic of the Teller County Emergency Response Team, in his
individual and official capacity, and
APRIL PETERSON, Cripple Creek Chief of Police, in her individual and official capacity,

    Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Plaintiff Paul Bauman claims damages for injuries sustained when Teller County

Sheriff's Deputies stormed a van Bauman was sleeping in, forced him out and onto the

ground, flex-cuffed him, and made him remain on the ground even though he had vomited

and was experiencing discomfort from his pacemaker. Bauman brings this action pursuant to

42 U.S.C. § 1983 and asserts three Fourth Amendment claims against all Defendants in

connection with the incident: (1) unlawful entry; (2) excessive force; and (3) false

arrest/unlawful seizure. [Doc. 1 at 10-20.]

The Cripple Creek Defendants are the City of Cripple Creek and April Peterson, who was a Sergeant with the Cripple Creek Police Department during the events in question, and is now the Cripple Creek Chief of Police. Bauman claims that she is liable as a supervisor because she set in motion the series of events that led to the constitutional violations, and that she is liable for failing to intervene because she was in close enough proximity to Bauman to see the actions of the Teller County Sheriff's Deputies and did nothing to stop them. Bauman premises the City of Cripple Creek's liability upon its alleged failure to adequately train its police officers, upon Peterson's actions during the incident as the final municipal decision-maker, and upon an unconstitutional practice or custom.

Peterson has moved for summary judgment, claiming qualified immunity. The City of Cripple Creek also seeks summary judgment and claims that municipal liability should not attach because there is no evidence in the record linking Bauman's injuries to a municipal policy or practice.

**A. Undisputed Facts**

On October 19, 2010, the City of Cripple Creek Police Department was notified of a large firearm theft at a home within the City; 62 long guns (two of them .50 caliber and one having a computerized sighting system), 24 handguns, and over 10,000 rounds of ammunition were reported missing. At the time, the then-Chief of Police for Cripple Creek was on vacation. Sergeant April Peterson responded to the call. Peterson contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to assist the investigation.

The next day, Peterson was at the house where the firearms and ammunition had been stolen when Thomas Graham approached her. Peterson knew Thomas Graham was a convicted felon with domestic violence charges, drug charges, weapons offenses/violations,

and charges of making false reports to law enforcement; and that he had a reputation for intoxication with a history of fighting law enforcement and possessing weapons.  Peterson also knew that Graham had occasionally provided useful information to police.

During their conversation at the house, Graham told Peterson that he had been contacted to buy guns that he believed were related to the theft.  Graham would not identify who contacted him, but told Peterson he could "make this happen."  Then, ATF Agents Greg Cooper and Peter Merenyi arrived.  Graham became skittish and immediately left.

Graham called Peterson shortly thereafter and told her that he was going to set a "drop" meeting with the people who contacted him.  Graham told Peterson that the meeting would happen at 9:00 p.m. at his RV.  Peterson said that the location was too dangerous and that the meeting should not occur in the City of Cripple Creek.  Graham said he would change the location.  Peterson thought Graham sounded agitated and excited during the conversation.

Peterson then contacted the Teller County Sheriff's Office to inform them of her conversations with Graham and to ask for assistance.  Peterson advised the Sheriff's Office that Graham had changed the plan regarding the "drop" several times, and that she and the ATF Agents had started to wonder if Graham himself had the guns.  Peterson also said that Teller County's tactical team may be needed because there was not enough manpower to cover the scene of the "drop" meeting, which potentially involved a dozen people and a large quantity of firearms and ammunition.  Teller County Undersheriff Stanley Bishop told Peterson that the Teller County Emergency Response Team ("ER Team") was on its way and would assemble at the Cripple Creek Police Department.

Around 5:00 p.m., Graham called Peterson and told her there was "a problem" and that he needed to speak with her at a nearby casino.  Peterson went to the casino but Graham did

not appear.   Meanwhile, the ATF Agents and Cripple Creek Police Officers Parks and Bausman were conducting surveillance on the dirt lot where Graham's RV was parked.   A silver van was also parked in the lot.   Around the time Graham was supposed to be meeting Peterson at the casino, the observing officers saw Graham arrive at the lot, go to the silver van, open the door, and go inside.   The officers believed Graham was highly intoxicated, based on his movements.   A few minutes later, Graham's girlfriend left the RV and sat in the van; she was looking around the lot, leading the officers to suspect she was acting as a look-out.   It is unclear how long Graham and his girlfriend were in the van.   They exited the van along with another male (later identified as Bauman), who walked with them to the RV, and then returned to the van and appeared to go to sleep.   Officer Bausman communicated this information to Peterson by telephone; Peterson then relayed it to Teller County Sheriff Mike Ensminger and Undersheriff Bishop.   Peterson also told Ensminger and Bishop that there was a possibility that weapons could be in the van.

Around dusk, Peterson, Sheriff Ensminger, Undersheriff Bishop, and members of the Teller County ER Team arrived in the vicinity of the dirt lot where Graham's RV and the silver van were parked.   Peterson, Ensminger, Bishop, Deputy Sheriff Joshua Weatherill (the senior member of the Teller County ER Team), and the ATF Agents conferred about their plan of action.   At about 6:30 p.m., it was decided (who decided is in dispute) that Peterson, Bishop, ATF Agent Merenyi and another Cripple Creek officer would go to the RV and talk to Graham to determine why he did not show up to meet Peterson at the casino; check on his physical safety; and see if he had any other information regarding the firearm theft.   It was further decided (again, it is disputed who decided) that the Teller County ER Team members would "cover" (the meaning of which is disputed) the silver van while the conversation with

4

Graham took place.   Deputy Weatherill instructed the other ER Team members regarding their assignment.   Peterson did not directly provide orders or instructions to Deputy Weatherill or the Teller County ER Team.

As Peterson and others approached the RV, Deputy Michael Romero saw Graham's girlfriend at the window and asked to see her hands.  She did not comply.  Several Teller County deputies entered the RV, engaged in a short altercation with Graham, and eventually handcuffed and removed him from the RV.

At the same time, Deputies Weatherill and Nick Hartbauer and two other Teller County ER Team members approached the silver van.   Weatherill and Hartbauer gave oral commands to the individual later identified as the Bauman to show his hands.  Bauman did so.   Weatherill then commanded Bauman to exit the vehicle.   Bauman did not comply. Weatherill and Hartbauer entered the van, grasped Bauman by his wrists, and forced him out of the back of the van and onto the ground.   Teller County Tactical Medic Jesse Baker approached the scene and, according to Weatherill's instruction, placed Bauman in flex-cuffs.   The deputies patted Bauman down for weapons.   Bauman told them that he had a pacemaker implant and was feeling uncomfortable.   An ambulance was immediately requested.   Bauman was transported to Penrose St. Francis hospital and then flown to St. Anthony's Hospital in Denver.

Peterson did not have verbal or physical contact with Bauman during the sequence of events described above and she did not witness the Teller County ER Team's apprehension of Bauman.

Teller County Deputy Hartbauer and Tactical Medic Baker received briefing information only from Deputy Weatherill.  They did not speak with Peterson on the night of the incident.

**B. Disputed Facts**

Plaintiff claims that when Sheriff Ensminger and Undersheriff Bishop arrived in Cripple Creek, Peterson told a police dispatcher to tell them that she thought the subjects at the parking lot being observed by Officer Bausman were "moving the guns out of the van right now." [Doc. 47 ¶ 33.] Defendants admit that Peterson made that statement to the policy dispatcher but claim there is no evidence establishing that the dispatcher relayed the information to Ensminger and Bishop; Defendants offer deposition testimony of Bishop and Weatherill stating that they were only aware of the "possibility" of guns in the van. [See Doc. 52 ¶ 33.] For the purposes of this Motion, it is assumed that Peterson's statement was known to Ensminger and Bishop.

Defendants assert that the decision to check on Graham and have the Teller County ER Team cover the adjacent silver van was made collectively by the officers at the scene. [See Doc. 42 ¶¶ 7-8.] Plaintiff claims that Peterson decided on that course of action herself. [See Doc. 47 ¶¶ 7-8.] Undersheriff Bishop testified that he, Peterson, Sheriff Ensminger, and Deputy Weatherill discussed the plan together; he did not say whether Peterson made the decision to have the Teller County ER Team cover the van. [See Doc. 42, Ex. E at 62:17-63:17.] Bishop also testified that Peterson "kept saying she [wanted] to do a welfare check" on Graham, and that "we agreed that we would go with her" to the RV and that the Teller County ER Team "would secure the van." [Doc. 47, Ex. C at 52:1-16.] The Court will assume that Peterson decided that the ER Team would secure Bauman's van.

Bauman claims that it was pre-determined that the ER Team was going to extract and flex-cuff the person believed to be in the van, relying on the deposition testimony of Deputy Weatherill. [See Doc. 47 ¶ 9 (citing Doc. 47, Ex. D at 48:3-16).] Deputy Weatherill's

6

testimony tends to prove only that he himself believed that the ER Team was ordered to "secure" the individual in the van, and that "secure" meant using flex-cuffs. [See Doc. 47, Ex. D at 57:24-58:25.] Weatherill's interpretation is undercut by Undersheriff Bishop's testimony that he told the ER Team to "secure the van," without any discussion of flex-cuffs. [See Doc. 42, Ex. E at 63:18-64:20.] Weatherill's testimony does not establish or support a reasonable inference that Peterson gave an order to or expected the ER Team to extract and flex-cuff the person in the van.

The parties dispute who was in charge of the Teller County ER Team. Defendants state that when the Teller County ER Team is called for an agency assist, the commander of the ER Team is in charge of the ER Team, even if the commanding officer of the requesting agency is otherwise in charge of the scene. [Doc. 42 ¶ 14.] Defendants assert that, while Peterson was in charge of the investigation and the overall scene, senior Teller County officials (Sheriff Ensminger, Undersheriff Bishop, and Deputy Weatherill) remained in charge of the ER Team. Testimony from Peterson, Undersheriff Bishop, and Deputy Weatherill corroborates that delineation of authority.[1]

---

[1] See Doc. 52, Ex. J at 114:24-115:6 (Peterson Depo.) (Q. And then in terms of – what was your understanding, on October 20, 2010, who would be, I guess, the commanding officer at the scene when you requested assistance? A. In regard to the investigation, it would have been myself and ATF. When it came to calling out the tactical team, that is a specialized team, and the sheriff's office is responsible for that team."); Doc. 42, Ex. E at 30:20-31:13 (Bishop Depo.) (Q. When you respond to a request for assist . . . who's in charge then of the scene? A. The scene would be in charge – it's the – would be that municipality. . . . Q. Okay. What – so you said 'the scene.' So that makes me think that you're thinking other aspects of that would not have been under the guise of Cripple Creek Police Department, so – A. Our ERT team . . . Q. And the ERT team is under the Teller County Sheriff's Office? A. Yes."); Doc. 47, Ex. D at 77:5-21 (Weatherill Depo.) ("Q. What was your understanding of who was in charge at this scene on October 20, 2010? . . . A. Sergeant Peterson being in charge of contacting Thomas Graham, the sheriff and undersheriff being in charge of the ERT team."); id. at 91:2-6 ("A. So if we go in to assist Cripple Creek Police Department with something, that chief of police is not in charge and dictates what the emergency response team does. The emergency response team is dictated and ran by the Teller County Sheriff's office.").

Plaintiff claims that, pursuant to an Intergovernmental Agreement ("IA") between the Cripple Creek Police and the Teller County Sheriff's Office, Peterson was in charge of all Teller County officers because she was the Commanding Officer of Cripple Creek at the time and the scene was in her jurisdiction.  The IA stated:

> Upon entering the jurisdiction of the Requesting Agency, an employee of the Responding Agency shall report immediately to the Commanding Officer of the Requesting Agency, and shall be under the direction and control of said Commanding Officer. . . . Nothing in this section shall prohibit or restrict the authority of superior officers from the Responding Agency to command subordinated officers of the Responding Agency while they are in the jurisdiction of the Requesting Agency, under the overall command of the Commanding Officer of the Requesting Agency.

[Doc. 47 ¶ 14; id., Ex. G ¶¶ 4(A), (C).]  Defendants deny that the Intergovernmental Agreement was in effect in October 2010, but the deposition testimony they cite to is inconclusive.[2]  Defendants also offer testimony from Peterson and Undersheriff Bishop that, regardless of whether the Agreement was in effect, in practice Cripple Creek always remains responsible for Cripple Creek personnel, and Teller County remains responsible for Teller County personnel.  [See Doc. 52 ¶14; id., Ex. J at 114:19-23 (Peterson Depo.); id., Ex. L at 36:7-16 (Bishop Depo.).]

Based on the parties' conflicting evidence, a reasonable juror could find that Peterson, who was undoubtedly in charge of the overall scene, was a "supervisor" of the Teller County ER Team during the events in question.  However, there is no evidence that she exercised

---

[2] See Doc. 52, Ex. L at 34:22-35:2 (Bishop Depo.) ("Q.  So is it your testimony that you don't think that that agreement was in effect in October of 2010?  A.  I don't know that it was in effect."); Doc. 52, Ex. J at 113:1-15 (Peterson Depo.) ("Q.  Do you know if this intergovernmental agreement was in effect on or about October 20, 2010?  A.  Technically, it wouldn't have been because this individual was no longer a sheriff.  Q.  Do you know if there was a different similar kind of agreement in effect?  A.  Not to my knowledge.  Q.  If you go back to the last page of this exhibit [the Intergovernmental Agreement], it says, "Termination, any Agency may withdraw from Agreement at any time upon 30 days' advance written notice to all other parties hereto."  Are you aware of any written notice that was ever given to the Cripple Creek Police Department terminating this agreement?  A.  No, I am not.").

that authority by ordering Teller County Deputies Weatherill and Hartbauer to remove Bauman from the van and flex-cuff him.

## C. Discussion

### 1. Peterson's Liability as a Supervisor

"Each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). A plaintiff seeking to hold an official liable as a supervisor therefore must show an "affirmative link" between the supervisor and the constitutional violation. Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010). There are three elements required to establish a successful § 1983 claim against a defendant based on her supervisory responsibilities: (1) personal involvement; (2) causation, and (3) state of mind. Id. Here, assuming the first two elements are satisfied, the Court concludes that Bauman has failed to create a genuine issue of material fact as to Peterson's state of mind and that Peterson is entitled to judgment as a matter of law.

A plaintiff can establish a culpable state of mind by showing that "the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." Serna v. Colo. Dept. of Corrs., 455 F.3d 1146, 1154 (10th Cir. 2006). Deliberate indifference requires that the official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." Id. at 1154-55. Mere negligence is not enough. Id. at 1151.

In Serna, an inmate at a high security prison sued the Director of Prisons ("Director Gasko") after the prison's Special Operations Response team ("SORT team") allegedly used excessive force against the inmate following a report that he had a firearm in his cell. Id. at

1149.  The Tenth Circuit concluded that the plaintiff had not established that Director Gasko was deliberately indifferent because:

> [t]he only record evidence is that Gasko believed the SORT team could safely and effectively respond to the threat of prison violence arising from the report of a loaded gun, and Serna has not challenged that evidence. Nor has [plaintiff] offered any evidence that Gasko turned a blind eye to evidence that would contradict that belief, such as a pattern or practice of constitutional abuses by his subordinates on prior occasions. . . . The evidence shows only that Gasko, as a high-level supervisor, authorized the use of the SORT team to respond to a dangerous situation at the warden's request. Nothing suggests he wanted to harm Serna or to ignore harm done by his subordinates.

Id. at 1155.  Here, Bauman has not offered any evidence showing that Peterson believed the Teller County ER Team was somehow incapable of safely and effectively discharging its duties in securing the van.  Bauman has also not offered evidence showing that Peterson turned a blind eye to a pattern of past abuses by Teller County's ER Team, or that any past abuses existed.  There is also nothing in the record to suggest that Peterson wanted to harm Bauman or to ignore harm done by the Teller County ER Team.  The evidence shows only that Peterson authorized (either personally, or collectively with the senior Teller County officials at the scene) the Teller County ER Team to secure the van in uncertain circumstances.

Bauman argues that Peterson was deliberately indifferent because she admitted that, in deciding to approach Graham's RV to speak with him, "she was putting herself, other law enforcement officers, and the occupants of the vehicles in extreme danger."  [Doc. 47 at 19.] The deliberate indifference standard is not met simply by showing that a tactical law enforcement decision creates a general risk of bodily harm.  Police officers confront dangerous situations every day, and must take actions in the interest of public and officer safety that inevitably carry risks.  Rather, it must be shown that the officer knew he was

creating a situation that created a substantial risk of "*constitutional* harm." Serna, 455 F.3d at 1155 (emphasis added); see also Dodds, 614 F.3d at 1206 (explaining that deliberate indifference analysis "requires us to determine whether the facts support the view . . . that Defendant knew his actions create a substantial risk of constitutional injury"). Peterson's decision to approach Graham's RV carried risks, of course, but that does not support a reasonable inference that she knew excessive force or an unlawful arrest of Bauman would occur. The record shows that the officers and deputies had a legitimate goal of investigating the disappearance of a large cache of firearms and checking on Graham's well-being. Cf. Dodds, 614 F.3d at 1206 (reasonable jury could conclude defendant was deliberately indifferent in part because defendant "[did] not suggest any 'legitimate goal' behind" conduct in question).

Bauman also argues that deliberate indifference can be inferred because Peterson communicated to Sheriff Ensminger and Undersheriff Bishop that there were weapons in the van, and failed to communicate that Bauman was sleeping in the van; thus, the Teller County ER Team approached the van believing that it was a more-dangerous situation than it in fact was. [See Doc. 47 at 19.] The record does not support Bauman's assertion that Peterson definitively said that guns were at the scene; the evidence tends to show that Peterson told Ensminger and Bishop of the possibility of guns being there. [See Doc. 47 ¶ 33 ("*I think* they are unloading the guns from a van right now . . . So tell him *we think* they are moving the guns out of the van right now.") (emphasis added).] Based on Graham's history, his apparent connection to the firearm theft, and his erratic behavior on the day of the incident, that possibility was real. And as for the report that Bauman appeared to be sleeping in the van, that did not foreclose the possibility that he was armed, or that he was pretending to

11

sleep and acting as a lookout for Graham.   There is nothing in the record to suggest that

Peterson willfully ignored material information or purposefully spread misinformation.

Accordingly, the Court cannot conclude that a factual dispute exists as to Peterson's

deliberate indifference.   Summary judgment in favor of Peterson is warranted on Bauman's

supervisory liability claim against her.

2.   Failure to Intervene

Bauman asserts that Peterson is liable because she failed to intervene and stop the Teller

County ER Team from violating his rights.   [See Doc. 47 at 22-23.]   The Tenth Circuit has

articulated the following standard for this theory of liability:

> [A]ll law enforcement officials have an affirmative duty to intervene to protect the
> constitutional rights of citizens from infringement by other law enforcement officers in
> their presence. An officer who fails to intercede is liable for the preventable harm caused
> by the actions of the other officers where that officer observes or has reason to know: (1)
> that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3)
> that any constitutional violation has been committed by a law enforcement official. In
> order for liability to attach, *there must have been a realistic opportunity to intervene to
> prevent the harm from occurring*. Whether an officer had sufficient time to intercede or
> was capable of preventing the harm being caused by another officer is an issue of fact for
> the jury unless, considering all the evidence, a reasonable jury could not possibly
> conclude otherwise.

Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008) (emphasis added).

Peterson has offered an affidavit stating that she did not know in advance that the Teller

County ER Team was going to use force on the occupant of the van, and that she believed

"cover" or "securing" the van meant observing it and taking any action that might be

necessary for officer and public safety.   [See Doc. 42, Ex. C ¶ 22.]   Bauman disputes

Peterson's assertion, but the evidence he offers does not create a genuine dispute of fact.   See

supra at 7.   Bauman also claims that a reasonable jury could conclude that Peterson had a

realistic opportunity to intervene.   [See Doc. 47 at 23.]   He does not support that claim with

record evidence, nor did he dispute the following fact in Defendants' Motion for Summary Judgment: "Peterson was positioned at Thomas Graham's RV and did not witness any incident involving Plaintiff." [Doc. 42 ¶ 13; see Doc. 47 ¶ 13 ("Admit.").] Accordingly, a reasonable juror could not conclude that Peterson had a realistic opportunity to intervene to prevent the Teller County Deputies from using force on Bauman; this forecloses Bauman's failure-to-intervene theory as a basis for recovery.

    3. Municipal Liability

To establish municipal liability against the City of Cripple Creek, Bauman must prove: (1) an underlying constitutional violation by Peterson and (2) that a municipal policy or practice caused his alleged injuries. See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 407 (1997). In his summary judgment briefing, Bauman asserted a failure-to-train theory in support of the second element. [See Doc. 47 at 24-25.] To prevail on this theory, Bauman must demonstrate, among other things, that the failure to train demonstrates deliberate indifference on the part of the municipality toward persons with whom its police officers come into contact. Allen v. Muskogee, 119 F.3d 837, 841-42 (10th Cir. 1997). According to the Tenth Circuit:

> [A] showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate. Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.

Id. at 842. Bauman has offered no evidence of a pattern of similar constitutional violations by Cripple Creek Police. To establish deliberate indifference based solely on the incident at issue here, Bauman would need to show that Cripple Creek has failed to adequately train its employees on the use of force. See id. He has not offered any evidence in that regard.

Therefore, Bauman's failure-to-train theory fails for lack of proof that Cripple Creek was deliberately indifferent to the Fourth Amendment rights of persons within its jurisdiction.

At the hearing on Defendants' Motion for Summary Judgment, Bauman hinted at two additional bases for municipal liability—namely, that Peterson was the final decision-maker for Cripple Creek as acting Chief of Police, and that therefore her decisions regarding the investigation and tactics at the scene are attributable to the City; and that Cripple Creek has a municipal practice or custom of tolerating "shoddy" police work.  Assuming Peterson was the City's final decision-maker during the incident, Bauman has not created a genuine dispute of fact as to Peterson's deliberate indifference, as discussed above.  Bauman's second theory fails because he has not offered any record evidence supporting his assertion that an unconstitutional municipal practice or custom exists.

Accordingly, even if Bauman could establish an underlying constitutional violation by Peterson, he has failed to show that a municipal policy or practice caused his alleged injuries.

**D.  Conclusion**

Upon the foregoing, it is

ORDERED that the Cripple Creek Defendants' Combined Motion for Summary Judgment is granted.  Defendant April Peterson and Defendant City of Cripple Creek shall be dismissed from this civil action.

Dated:  March 18, 2014.

BY THE COURT:

**s/Richard P. Matsch**
_____
Richard P. Matsch
Senior District Judge

14